# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 12, 2005          Decided June 28, 2005

No. 04-1172

ITT INDUSTRIES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,
AFL-CIO,
INTERVENOR

———

Consolidated with
04-1198

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the
National Labor Relations Board

———

*Curtis L. Mack* argued the cause for petitioner. With him
on the briefs were *Mark L. Keenan* and *Brennan W. Bolt*.

*Anne M. Lofaso*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Linda Dreeben*, Assistant General Counsel.

*James B. Coppess* argued the cause for intervenor. With him on the brief were *Lynn K. Rhinehart* and *Blair K. Simmons*.

Before: RANDOLPH, GARLAND, and ROBERTS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The National Labor Relations Board determined that ITT Industries, Inc. violated section 8(a)(1) of the National Labor Relations Act when it refused to permit employees from one ITT plant to distribute pro-union handbills in the parking lot of another ITT facility. ITT petitions for review of that decision. Because we conclude that the Board reasonably interpreted the Act, we deny the petition and grant the Board's application for enforcement of its order.

I

ITT Industries, Inc. is the parent company of ITT Automotive, Inc., an automotive parts manufacturer that operates ten plants, three of which are located in East Tawas, Tawas City, and Oscoda, Michigan. These are known collectively as the "Northern Plants," and each is within a short commuting distance of the others. *ITT Industries, Inc.*, 341 N.L.R.B. No. 118, at 1 n.4 (May 13, 2004). The East Tawas facility (the site of the handbilling in this case) is situated between the other two, 14 miles from the Oscoda facility (the

plant at which the handbillers are employed) and 5-6 miles from the Tawas City facility. *Id.* at 1. The East Tawas and Tawas City plants have about 180 employees each, while the Oscoda plant has about 600 employees. *Id.* ITT has from time to time transferred employees from one plant to another. *Id.* at 1 & n.5.

In 1994, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) launched a campaign to organize employees of the Northern Plants. It lost a representation election in March 1995, but the National Labor Relations Board (NLRB) found that ITT had improperly interfered with the election and set aside the results. In early 1998, the union remounted its organizing drive. It filed an election petition in June, and the Board scheduled a representation election for July 1998. ITT stipulated that the appropriate bargaining unit would encompass nonsupervisory employees from all three plants. *See ITT Industries, Inc.*, 331 N.L.R.B. 4, 6 (2000) (*First ITT Decision*).[1]

In the spring of 1998, employees of ITT's Oscoda plant twice attempted to distribute handbills and to solicit signatures in the parking lot of the East Tawas facility. Both incidents occurred at approximately 6:00 a.m. Although the handbillers identified themselves as ITT employees from the Oscoda plant, East Tawas supervisors ordered them to leave or face arrest for trespass. Each time, the handbillers left without incident.

Thereafter, the union filed unfair labor practice charges with the NLRB, which an administrative law judge (ALJ) heard in 1999. To resolve the charge that ITT had wrongfully denied access to its off-site employees, the ALJ used the NLRB's test

---

[1]Just prior to the date of the scheduled election, and after filing the unfair labor practice charge that gave rise to this case, the UAW withdrew its election petition.

for evaluating employer restrictions on off-duty employees' access to areas surrounding their own work sites. That test, set forth in *Tri-County Medical Center*, provides: "[E]xcept where justified by business reasons, a rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid." 222 N.L.R.B. 1089, 1089 (1976). Applying that rubric, the ALJ found ITT's proffered business justifications inadequate and concluded that ITT had violated section 8(a)(1) of the National Labor Relations Act (NLRA). In 2000, the Board affirmed. *See First ITT Decision*, 331 N.L.R.B. at 4.

ITT petitioned for judicial review, contending that the Board had overstepped its authority by granting to off-site employees more than the limited access rights of nonemployee union organizers. The test applicable to the latter, as enunciated in *NLRB v. Babcock & Wilcox Co.*, provides that employers may bar nonemployee union organizers from company property, unless employees are otherwise "beyond the reach of reasonable union efforts to communicate with them." 351 U.S. 105, 113 (1956); *see Lechmere, Inc. v. NLRB*, 502 U.S. 527, 534 (1992). Nonemployees' access is so limited because "any right they may have to solicit on an employer's property is a derivative of the right of that employer's employees to exercise their organization rights effectively." *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 206 n.42 (1978). In ITT's view, the Board should have applied *Babcock*, not *Tri-County*, to resolve the UAW's charges.

This court reviewed the Board's decision in *ITT Industries, Inc. v. NLRB*, 251 F.3d 995, 1006-07 (D.C. Cir. 2001). We noted that although the Supreme Court's "access cases do not foreclose the possibility that off-site employees might enjoy some measure of free-standing, nonderivative access rights, they do make clear that the reasonableness of such an interpretation

depends in large part on the Board's considered justifications for extending greater access rights to trespassing employees than trespassing nonemployee union organizers." *Id.* at 1004. Because we concluded that the Board had failed -- in several respects detailed in Part II below -- "to engage in considered analysis and explain its chosen interpretation," *id.*, we vacated the Board's determination that ITT had committed an unfair labor practice and remanded the case for further proceedings.

The NLRB initially addressed our concerns in *First Healthcare Corp.*, 336 N.L.R.B. 646 (2001) (*Hillhaven*), a case that posed the same issues as our remand but reached the Board first. The Board summarized its conclusions as follows:

> (1) [U]nder Section 7 of the Act, offsite employees (in contrast to nonemployee union organizers) have a nonderivative access right, for organizational purposes, to their employer's facilities; (2) . . . an employer may well have heightened private property-right concerns when offsite (as opposed to onsite) employees seek access to its property to exercise their Section 7 rights; but (3) . . . on balance, the Section 7 organizational rights of offsite employees entitle them to access to the outside, nonworking areas of the employer's property, except where justified by business reasons, which may involve considerations not applicable to access by off-duty, onsite employees.

*Id.* at 648. The Sixth Circuit enforced the Board's *Hillhaven* order, concluding that the Board had remedied the deficiencies identified in our *ITT Industries* opinion, and that it had reasonably balanced the off-site employees' section 7 rights against the employer's private property interests. *First Healthcare Corp. v. NLRB*, 344 F.3d 523, 538, 539-40 (6th Cir. 2003).

The NLRB applied the *Hillhaven* framework when it considered our *ITT Industries* decision on remand in 2004. *See ITT Industries, Inc.*, 341 N.L.R.B. No. 118, at 4 (May 13, 2004) (*ITT Remand Decision*). First, it determined that the Oscoda employees had nonderivative section 7 rights because "the offsite employees were seeking to organize the East Tawas employees in a single, three-plant unit which included their own Oscoda plant." *Id.* Next, the Board examined ITT's business justification -- namely, physical and personal security -- for its no-access policy. *Id.* at 5. Finally, the Board concluded that, although "the record demonstrates that [ITT] had legitimate security concerns, . . . these concerns do not justify the total exclusion of [ITT's] offsite employees from its parking lot." *Id*. Because the employer had thus "failed to present a business reason sufficient to justify prohibiting [its off-site employees'] access to the parking lot," the Board reaffirmed its earlier finding that ITT violated section 8(a)(1). *Id.* at 7.

In its petition for review, ITT raises essentially two points. First, it contends that the NLRB's *Hillhaven* test is unresponsive to our remand and is an unreasonable interpretation of the NLRA. Second, it argues that, even if the *Hillhaven* test is proper, its application to the instant case was unreasonable and unsupported by substantial evidence. We address the first point in Part III and the second in Part IV. We begin, however, with a more detailed discussion of the nature of our remand in *ITT Industries*.

II

Section 7 of the NLRA provides that employees "shall have the right to self-organization, [and] to form, join, or assist labor organizations." 29 U.S.C. § 157. Section 8(a)(1) declares that it "shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of

the rights guaranteed in" section 7. *Id.* § 158(a)(1). Under the Act, "employee" is defined to "include any employee, and shall not be limited to the employees of a particular employer." *Id.* § 152(3).

"Like other administrative agencies, the NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers." *ITT Industries*, 251 F.3d at 999 (quoting *Lechmere*, 502 U.S. at 536 (citing *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984))). As we noted in *ITT Industries*, section 7 is ambiguous -- for purposes of this case -- because it "does not itself speak of access rights, much less the access rights of off-site employees." *Id.* at 1000. That ambiguity "counsel[s] *Chevron* deference" -- unless "courts have settled on [the] statute's clear meaning," in which event we must "adhere to that determination under the doctrine of *stare decisis*." *Id.* (quoting *Lechmere*, 502 U.S. at 536-37). And as we further noted, the courts have not settled on the NLRA's clear meaning regarding the issues raised by the petitioner. To the contrary, "[n]o court has decided the specific question we face here, *i.e.*, the scope of the Board's authority under §§ 7 and 8(a)(1) to prevent employers from prohibiting parking lot access to off-site employees who are seeking to engage in organizational activities that would be lawful if pursued by on-site employees." *Id.*

Our decision in *ITT Industries* traced the two lines of judicial opinions that leave the gap now confronting us. The font of the first line was *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945). There, the Supreme Court affirmed the NLRB's ruling that an employer may not prohibit distribution of organizational literature by off-duty employees in nonworking areas, without a showing that the ban is necessary to maintain plant discipline or production. *See id.* at 803 n.10, 804; *see also Eastex, Inc. v. NLRB*, 437 U.S. 556, 570-71 (1978). The

NLRB's *Tri-County* balancing test followed from *Republic Aviation*. *See Tri-County*, 222 N.L.R.B. at 1089 (relying on *Bulova Watch Co.*, 208 N.L.R.B. 798, 798 (1974), which adopted the dissent's interpretation of *Republic Aviation* in *GTE Lenkurt, Inc.*, 204 N.L.R.B. 921, 923 (1973)).

The second line of precedents began with *Babcock*, in which the Supreme Court held that the Board cannot order employers to grant nonemployee union organizers access to company property, absent a showing that employees are otherwise inaccessible through reasonable efforts. *See Babcock*, 351 U.S. at 112. There, the Court faulted the Board for "fail[ing] to make a distinction between rules of law applicable to employees and those applicable to nonemployees." *Id.* at 113. As we explained in *ITT Industries*, *Babcock* stands for the proposition that "nonemployees' access rights are merely derivative of on-site employees' organizational rights; nonemployees enjoy no independent, free-standing § 7 right of access." *ITT Industries*, 251 F.3d at 1000.

Continuing to trace the development of the two strands of cases, *see ITT Industries*, 251 F.3d at 1001-02 (discussing *Hudgens v. NLRB*, 424 U.S. 507 (1976), and *Eastex*, 437 U.S. at 571), we quoted the Supreme Court's description of the two lines in *Lechmere*:

> In *Babcock*, . . . we held that the Act drew a distinction "of substance" between the union activities of employees and nonemployees. In cases involving *employee* activities, we noted with approval, the Board "balanced the conflicting interests of employees to receive information on self-organization on the company's property from fellow employees during nonworking time, with the employer's right to control the use of his property." In cases involving

*nonemployee* activities (like those at issue in *Babcock* itself), however, the Board was not permitted to engage in that same balancing (and we reversed the Board for having done so).

*Id.* at 1002 (quoting *Lechmere*, 502 U.S. at 537 (quoting *Babcock*, 351 U.S. at 109-10, 113) (citations omitted)). *Lechmere*, we said, "reaffirmed *Babcock*'s central thesis that § 7 extends only derivative access rights to nonemployee union organizers." *Id.* at 1002-03.

This foray into the case law persuaded us that Supreme Court precedents "simply do not answer the question before us." *Id.* at 1003. After all, the "distinction 'of substance'" discerned in *Lechmere* and *Babcock* was "between the union activities of employees and nonemployees," *Lechmere*, 502 U.S. at 537, not between those of on- and off-site employees:

> The Court never has professed to define the scope of the term "employee" in *Babcock*, *Hudgens*, *Republic Aviation*, *Eastex*, or *Lechmere*. And these cases certainly do not stand for the proposition that all trespassers, whether they be nonemployee union organizers or off-site employees, possess only derivative § 7 access rights.

*ITT Industries*, 251 F.3d at 1003. Because "the Court's cases do not bespeak a clear answer, and . . . the statute is silent on the point," we concluded that "we must defer to the Board's interpretation *if reasonable*." *Id.*

The problem with the Board's order, however, was that "we simply [could not] assess the reasonableness of the Board's decision to apply the *Tri-County* test to off-site employees." *Id.* at 1004. First, the Board had failed "even to acknowledge that

the question of off-site employee access rights was an open one," but rather had "decided *sub silentio* that § 7 guarantees all off-site employees . . . some measure of free standing, nonderivative access rights." *Id.* Second, "[n]oticeably absent from [the Board's] discussion [was] any mention of the employer's property rights or the different interpretive considerations presented by trespassing employees." *Id.* at 1005. On the one hand, the Board had failed to offer "justifications for extending greater access rights to trespassing employees than trespassing nonemployee union organizers." *Id.* at 1004. On the other, the Board had failed to consider the "heightened property concerns" -- involving "security, traffic control, personnel, and like issues" -- that arise when off-site rather than on-site employees seek access. *Id.* at 1005. Finally, the Board had also "failed to explain why the scope of [the off-site employees'] rights should be defined by the same *Tri-County* balancing test used to delineate the scope of on-site employee access rights." *Id.* We warned that "[i]f, on remand, the Board determines that § 7 indeed extends nonderivative access rights to off-site employees," it would have to "adopt a balancing test that takes proper account of an employer's predictably heightened property concerns" when off-site employees are involved. *Id.*

It should be clear from this discussion that our decision in *ITT Industries* did not bar the NLRB from concluding, on remand, that off-site employees possess nonderivative section 7 rights to access outside, nonworking areas of their employer's property, or from adopting a test that rendered ITT's no-access policy an unfair labor practice. Rather, we merely concluded that "the Board was obliged to engage in considered analysis and explain its chosen interpretation." *Id*. at 1004. We cautioned, however, that if the Board chose to reaffirm its prior decision, it would have to: (1) explain why it believes off-site employees possess a nonderivative right of access under section

7; (2) take into consideration the property interests of the employer; and (3) devise a balancing test that accommodates an employer's heightened property concerns when the access of off-site rather than on-site employees is at issue.

In the following Part, we consider whether the Board satisfied these requirements of our remand, and whether the balancing test it adopted represents a reasonable interpretation of the NLRA.

## III

In order to justify the approach it adopted in this case, the NLRB may rely both on the explanation it offered in its remand decision and on the more extensive rationale it set forth in *Hillhaven* and incorporated into the remand decision. As we said in *ITT Industries*, "the Board is not obligated to justify its interpretation anew with every application if it has done so adequately in a previous decision." 251 F.3d at 1004. We conclude that, taken together, *Hillhaven* and the remand decision satisfactorily resolved the three deficiencies we identified in our review of the Board's initial *ITT* decision.

1. The first problem we discerned was the Board's failure to state whether, and if so why, off-site employees (unlike nonemployee organizers) possess a nonderivative right of access under section 7. The Board's post-remand decisions at last addressed the point directly, concluding that off-site employees *do* "have a nonderivative access right, for organizational purposes, to their employer's facilities." *ITT Remand Decision*, 341 N.L.R.B. No. 118, at 3 (quoting *Hillhaven*, 336 N.L.R.B. at 648). And the Board not only explained that conclusion, it did so reasonably.

As the Board stated in *Hillhaven*, off-site employees "are not only 'employees' within the broad scope of Section 2(3) of the Act, they are 'employees' in the narrow sense: 'employees of a particular employer' (in the Act's words), that is, employees of the employer who would exclude them from its property." 336 N.L.R.B. at 648. "Clearly, then, these workers are different in important respects from persons who themselves have no employment relationship with the particular employer." *Id.* Moreover, "when offsite employees seek to organize similarly situated employees at another employer facility, the employees seek strength in numbers to increase the power of their union and ultimately to improve their own working conditions." *ITT Remand Decision*, 341 N.L.R.B. No. 118, at 3. This reasonably explains the Board's conclusion that the right claimed by such off-site employees is personal rather than derivative: employees who seek to make common cause with similarly situated employees of the same employer are seeking to advance their *own* interests -- not just those of the employees they target, as is the case for nonemployee organizers. Thus, the "core concerns of Section 7, which protects the 'right to self-organization,' undeniably are implicated." *Hillhaven*, 336 N.L.R.B. at 649.

ITT objects to the Board's reliance on this "own interests" argument, contending that the *Hillhaven* test does not actually require that the off-site employees and their on-site targets be similarly situated before access can be compelled. Counsel for the NLRB and UAW disagree, each insisting that similarity is a threshold requirement of the test. *See* Oral Arg. Tape at 38:35-39:21, 50:04-51:13. There is no question that there is a degree of ambiguity in the text of *Hillhaven*, with some passages making no mention of a similarity requirement, *see, e.g.*, 336 N.L.R.B. at 650 ("[T]he Section 7 organizational rights of offsite employees entitle them to access to the outside, nonworking areas of the employer's property. . . ."), and others apparently treating it as a prerequisite, *see, e.g.*, *id*. at 648

("*When* an offsite employee seeks to encourage the organization of similarly situated employees . . . , the employee seeks to further his own welfare." (emphasis added)).

But we sit in judgment on the NLRB's decision in the *ITT* remand, not on the decision in *Hillhaven* per se. And in describing its understanding of *Hillhaven*, the *ITT* remand decision certainly appeared to treat a finding of similarity as a condition precedent for a finding that the handbillers had nonderivative section 7 rights -- itself a prerequisite for application of *Hillhaven*'s balancing test. *See ITT Remand Decision*, 341 N.L.R.B. No. 118, at 3 ("With respect to the section 7 rights of offsite employees, the Board stressed [in *Hillhaven*] that *when* offsite employees seek to organize similarly situated employees at another employer facility, the employees seek strength in numbers . . . ultimately to improve their own working conditions." (emphasis added)). More important, as we discuss in Part IV, there is no doubt that in this case the NLRB's application of the *Hillhaven* test turned on the fact that the Oscoda and East Tawas employees were similarly situated. That is a sufficient basis for us to conclude that there is a reasonable connection between the rationale the Board offered and the test it applied in this case.

2. The second problem that *ITT Industries* discerned in the NLRB's first *ITT* decision was the Board's failure to take into account the property interests of the employer vis-à-vis the trespassing, off-site employees. Following our remand, the Board did expressly consider those interests. *Hillhaven* acknowledged our observation that "offsite employees -- in contrast to onsite employees . . . -- may be regarded as trespassers by the employer," and that "this fact must be considered in weighing the access rights of offsite employees." 336 N.L.R.B. at 649. But it also reasonably noted that "even onsite employees arguably are trespassers on the employer's

property if they seek access while off duty, a time when they have not been invited onto the property," *id.* at 650, as ITT counsel conceded at oral argument, *see* Oral Arg. Tape at 16:26-18:33.[2]   "There is an inherent tension, then," the Board recognized, "between an employer's property rights and the Section 7 rights of its employees" -- a tension that cannot be resolved merely by reference to the law of trespass.   336 N.L.R.B. at 650.  Rather, as the Supreme Court said in *Hudgens v. NLRB*, it is "the task of the Board . . . to resolve conflicts between § 7 rights and private property rights, 'and to seek a proper accommodation between the two.'"   424 U.S. at 521 (quoting *Central Hardware Co. v. NLRB*, 407 U.S. 539, 543

---

[2]In its briefs, ITT argued that on-site employees are unlike off-site employees because the former are "rightfully on the employer's property [and] do not become trespassers by engaging in Section 7 activities."  Pet'r Reply Br. at 5; *see* Pet'r Br. at 30-32.  But this just begs the question.  Purely from the perspective of trespass law, on-site employees may exceed the scope of their invitation to access, and so not be "rightfully" on, the employer's property when they handbill at a place or time forbidden by their employer.  *See* RESTATEMENT (SECOND) OF TORTS § 168 (1965) (stating that a "conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with");  *id.* § 170 (providing that a "consent given by a possessor of land to the actor's presence on the land during a specified period of time does not create a privilege to enter or remain on the land at any other time"); *see also id.* § 168 cmt. b, illus. 2.  Thus, given that section 7 nonetheless entitles on-site employees to engage in organizational activities on company property, the decisive question is still whether section 7 entitles off-site employees to some form of access as well.  *Cf. Lechmere*, 502 U.S. at 531 (noting that "§ 7 of the NLRA may, in certain limited circumstances, restrict an employer's right to exclude [even] nonemployee union organizers from his property"); *New York New York, LLC v. NLRB*, 313 F.3d 585, 589 (D.C. Cir. 2002) (noting that it is employees' section 7 rights that permit them to organize on employer property, not the operation of trespass law).

(1972)). "What is 'a proper accommodation' in any situation may largely depend upon the content and the context of the § 7 rights being asserted." *Id.*

In examining that context, the Board noted that "the situation of offsite employees implicates some distinct considerations" from that of either nonemployees or on-site employees. *Hillhaven*, 336 N.L.R.B. at 649. Although "[o]n one view, [off-site] employees are . . . 'strangers' to the employer, . . . [o]f critical importance, on the other hand, is the fact that an employment relationship exists between them and the employer, which distinguishes offsite employees from the ordinary trespasser, who truly is a stranger." *Id.* "The existence of an employment relationship," the Board said, "means that the employer has a lawful means of exercising control over the offsite employee (even regarded as trespasser), independent of its property rights." *Id.* That ability to exercise control provides a reasonable basis for the Board's conclusion that permitting access by off-site employees trenches less seriously on the employer's property interests than would permitting access by nonemployees. As the Board explained: "Surely it is easier for an employer to regulate the conduct of an employee -- as a legal and a practical matter -- than it is for an employer to control a complete stranger's infringement on its property interests. The employer, after all, controls the employee's livelihood." *ITT Remand Decision*, 341 N.L.R.B. No. 118, at 4 (quoting *Hillhaven*, 336 N.L.R.B. at 649).

But while the Board thus determined that access for off-site employees impinged less upon an employer's property interests than did access for nonemployees, it cautioned that it was *not* saying "that in protecting its interests and preserving its property rights, an employer dealing with offsite employees faces precisely the same situation as it would when confronted by the access claims of onsite employees." *Hillhaven*, 336 N.L.R.B. at

649. The Board recognized that the "employee status of offsite employees . . . may be more difficult to determine, at least initially," and that there "may be other, unique problems involved, as well," citing our statement in *ITT Industries* that the "employer's right to control the disputed premises likely implicates security, traffic control, personnel, and like issues that do not arise when only on-site employee access is involved." *Id.* at 649-50 (quoting *ITT Industries*, 251 F.3d at 1005). The NLRB thus reasonably concluded that, while access by off-site employees raised fewer concerns than access by nonemployees, "an employer may well have heightened private property-right concerns when offsite (as opposed to onsite) employees seek access to its property to exercise their Section 7 rights." *ITT Remand Decision*, 341 N.L.R.B. No. 118, at 3 (quoting *Hillhaven*, 336 N.L.R.B. at 648).

3. The final problem with the NLRB's first *ITT* decision was that it appeared to adopt for off-site employees the same "balancing test used to delineate the scope of on-site employee access rights," and thus did not "take[] proper account of an employer's predictably heightened property concerns" when off-site employees are involved. *ITT Industries*, 251 F.3d at 1005. This time, however, the Board did take proper account. Like the *Tri-County* test, the *Hillhaven* test provides that "[o]n balance, . . . the Section 7 organizational rights of offsite employees entitle them to access to the outside, nonworking areas of the employer's property, *except where justified by business reasons*." *Hillhaven*, 336 N.L.R.B. at 650 (emphasis added). But "[i]n weighing those reasons," the Board promised, "we will take into account an employer's 'predictably heightened property concerns' . . . when offsite, as opposed to onsite, employees are involved." *Id.*

ITT disputes the NLRB's contention that the *Hillhaven* test really is different from the *Tri-County* test applied to on-site

employees, since both require the employer to provide access unless justified by business reasons. *Hillhaven*, however, not only promised that the Board would take account of the employer's heightened property concerns in the case of off-site employees, but also declared that the business justifications for denying access to off-site employees "may involve considerations not applicable to access by off-duty, onsite employees." *ITT Remand Decision*, 341 N.L.R.B. No. 118, at 3 (quoting *Hillhaven*, 336 N.L.R.B. at 648). In this way, the Board said, "the test for determining the right to access for offsite visiting employees differs, at least in practical effect, from the *Tri-County* test for off-duty, onsite employees." *Id.* (quoting *Hillhaven*, 336 N.L.R.B. at 648). For example, under *Hillhaven* the heightened problems that access by off-site employees may pose for security and traffic control "might well justify an employer's restriction (or even prohibition) of such access." *Id.* at 3 n.28 (quoting *Hillhaven*, 336 N.L.R.B. at 650). And greater difficulty in determining the employee status of offsite employees might justify "requir[ing] apparent trespassers to identify themselves . . . to determine whether the person seeking access is, in fact, an offsite employee of the employer." *Id.* (quoting *Hillhaven*, 336 N.L.R.B. at 650).

All of this suggests that the Board is committed, at least in the abstract, to analyzing an employer's business justifications with greater deference when off-site rather than on-site employees are involved. As we shall see in Part IV, the Board fulfilled that commitment in the case now before us.

## IV

In this Part, we consider ITT's contention that even if the *Hillhaven* test is proper, its application to the instant case is

unreasonable and unsupported by substantial evidence.[3] We conclude, to the contrary, that the Board reasonably applied *Hillhaven* and that its findings were supported by substantial evidence. The Board's determination that ITT violated section 8(a)(1) by barring the off-site employees from handbilling in its parking lot was therefore permissible.

1. The NLRB began its analysis on remand by considering the scope of the section 7 rights of the handbilling employees. *See ITT Remand Decision*, 341 N.L.R.B. No. 118, at 3. "Significantly," it noted, "the offsite employees were seeking to organize the East Tawas employees in a single, three-plant unit which included their own Oscoda plant." *Id.* Indeed, the employer had stipulated to the appropriateness of such a unit. *See First ITT Decision*, 331 N.L.R.B. at 6; *see also ITT Remand Decision*, 341 N.L.R.B. No. 118, at 1 (noting that the three plants are within short commuting distance of one another and that ITT periodically transferred employees from one plant to another). Under these circumstances, the Board's conclusion that the employees were similarly situated, and therefore that the off-site employees possessed nonderivative section 7 rights, was reasonable. As the Board said, the "offsite employee's personal stake in organizing his counterparts at a different employer facility is clearest where he is, or will be, part of a multifacility bargaining unit that includes onsite employees." *Id.* at 4 (quoting *Hillhaven*, 336 N.L.R.B. at 649).

---

[3]*See Lee Lumber & Bldg. Material Corp. v. NLRB*, 310 F.3d 209, 216 (D.C. Cir. 2002) (stating that this court "'review[s] the Board's factual conclusions' only for 'substantial evidence,' and must 'uphold the Board's application of law to facts unless arbitrary or otherwise erroneous'" (quoting *Harter Tomato Products Co. v. NLRB*, 133 F.3d 934, 937 (D.C. Cir. 1998))).

ITT correctly points out that, in *Hillhaven*, the Board declared that "a similar self-interest" can arise "even where the unorganized employees may be in a different bargaining unit." *Hillhaven*, 336 N.L.R.B. at 649. But such a case is not before us, and we need not decide it now. As there is no dispute in the instant case that a single bargaining unit encompassing the three groups of employees would be appropriate, we cannot dispute the reasonableness of the Board's conclusion that "the Section 7 rights at issue *here* are indeed substantial." *ITT Remand Decision*, 341 N.L.R.B. No. 118, at 4 (emphasis added).[4]

2. The Board next addressed the question of ITT's private property interests. *See id.* ITT had "prohibited access to its parking lot to the Oscoda employees based on security considerations." *Id.* In support of the no-access rule, ITT cited "various incidents of vandalism to vehicles and . . . threats to personal security that occurred over the past few years." *Id.* These involved instances in which the window of a car was shattered, the lug nuts on a supervisor's car were loosened, car tires were slashed, a stranger entered the property to fight with an employee, and the estranged husband of an employee telephoned to say he had a gun and was coming after his wife. *Id.* at 2.

The Board acknowledged that ITT had barred the off-site employees from the parking lot on the basis of a neutral rule that denied access to any person not employed at East Tawas, with

---

[4] *Cf. Speedrack Prods. Group, Ltd. v. NLRB*, 114 F.3d 1276, 1278 (D.C. Cir. 1997) ("An employee is eligible to vote in a representation election if she shares 'a community of interest' with the other employees in the unit. The Board examines various factors to determine if a community of interest exists, such as the similarity of wages, benefits, skills, duties, working conditions, and supervision of the employee . . . .").

the exception of relatives and friends of employees. (The latter were permitted to drop off and pick up employees in the parking lot, but were not allowed to get out of their vehicles. *See id.* at 4.) The Board also found that the employer had advanced "legitimate security concerns" that would have to be considered in assessing whether off-site employees could be barred. *Id.* "[R]easonable measures to protect against legitimate security threats do not," the Board said, "'take a back seat' to employees' Section 7 rights." *Id.* at 5. Thus, the question was not whether *any* limitations on access by off-site employees were permissible, but whether ITT's concerns "justif[ied] the *total* exclusion of [its] offsite employees from its parking lot." *Id.* at 4 (emphasis added); *see id.* at 5.

3. Applying the *Hillhaven* balancing test, the Board concluded that ITT's security concerns did not justify wholly denying its off-site employees the access they sought. The remand decision gave three reasons for that conclusion.

First, "the handbillers were not strangers to [ITT]; they were [ITT's] employees." *Id.* at 4. The Board noted that the handbillers had announced their identity and purpose when they came on the property, and that there was "no evidence that [ITT] questioned their intent to handbill or their claim to be its employees." *Id.* Although ITT, "of course, had the authority to require the Oscoda employees to specifically verify that they were its employees, . . . it did not do [so] here." *Id.* at 4 n.35. The Board found that, as identified employees of ITT, the handbillers' "presence did not implicate the security concerns posed by the presence of nonemployees on [ITT's] property," as was the case for several of the incidents that had generated the no-access policy. *Id.* at 4. In particular, the Board found that, having "identified themselves as employees . . . , it was understood that they were subject to discipline if they engaged in vandalism or other misconduct." *Id.*

Second, the NLRB noted that the Oscoda employees "attempted to handbill at 6 a.m., a time when there was a lot of activity in the parking lot." *Id.* The Board reasonably observed that this "was hardly a time when the parking lot was . . . open to unobserved vandalism, such as had occurred in the past." *Id.* Moreover, there was "absolutely no evidence of any misconduct or proclivity toward such misconduct by any of the Oscoda employees who were attempting to handbill." *Id.*

Third, the employer did not raise any other property concerns. There was "no evidence, or claim, that the handbillers would cause any disruption to traffic in the parking lot." *Id.* Nor did the record "demonstrate the possibility of any unique logistical problems that might have arisen from the handbilling." *Id.*

The Board concluded, in view of these factors, that ITT's "complete refusal to allow handbilling by its own offsite employees was not reasonably tailored to address its concerns about protecting its property against vandalism or violence against its onsite employees." *Id.* We cannot say that this application of the *Hillhaven* test was arbitrary or capricious.

ITT raises two further challenges to the application of the Board's balancing test. First, it contends that the NLRB impermissibly substituted its business judgment for that of the company when, in the course of examining ITT's security concerns, the Board stated that it was "also significant that [ITT] did not install security cameras on its property, did not employ security guards to protect the premises, and did not request the police to patrol the area." *Id.* ITT maintains that this statement reflects the Board's own business judgment that it would have been better to adopt those security measures, rather than the no-access policy that ITT actually chose.

We do not read the NLRB's remand decision that way. To the contrary, the Board acknowledged that "the decision to install cameras or hire security guards is an issue of [ITT's] own business judgment," and insisted that "we do not seek to substitute our judgment for that of [ITT]." *Id.* An ITT supervisor had testified that, instead of installing cameras or hiring guards, ITT relied on "an informal practice whereby 'everybody kind of looks out for each other.'" *Id.* The Board found that ITT's "claimed need" for a rule totally excluding off-site employees "must be afforded some degree of skepticism when there are other measures . . . that have not been taken *because* [*ITT*] *believes* that it is enough to satisfy security concerns that everyone 'looks out for one another.'" *Id.* (emphasis added). From this, the Board simply concluded that barring off-site employees from the parking lot at 6 a.m. was not justified by ITT's asserted rationale -- security in the lot -- since there was sufficient activity at that time to ensure that "look[ing] out for one another" would take care of the problem.

ITT also contends that the availability of other means of communicating with the East Tawas employees, specifically the ability to handbill them off-site, compels the conclusion that ITT's no-access rule was lawful. As the Board pointed out, however, "inquiry into such considerations 'is made only when *nonemployees* are on the employer's property.'" *Id.* at 5 (quoting *First Healthcare*, 344 F.3d at 541); *see Babcock*, 351 U.S. at 113-14. Having reasonably concluded that off-site employees have section 7 rights not possessed by nonemployees, *see supra* Part III, it was also reasonable for the NLRB to decide not to apply the same test to off-site employees that it applies to nonemployees.

V

The Supreme Court "has emphasized often that the NLRB has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990).[5] For that reason, a court must accord a Board rule "considerable deference" and uphold it as long as it is "rational and consistent" with the NLRA, "even if we would have formulated a different rule had we sat on the Board." *Id.* at 786-87. ITT disparages this declaration of judicial deference as a "tired mantra." Pet'r Reply Br. at 2. But while there is no question that it is oft-repeated,[6] that hardly renders it "tired." To the contrary, constant repetition serves to remind us of the line we must not cross if we are to keep judicial review separate from the formulation of public policy.

We conclude that the Board has constructed a rational framework for evaluating the efforts of off-site employees to conduct organizing activity in outside, nonworking areas of their employer's property, and that the Board rationally applied that

---

[5]"Because it is to the Board that Congress entrusted the task of 'applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms,' that body, if it is to accomplish the task which Congress set for it, necessarily must have authority to formulate rules to fill the interstices of the broad statutory provisions." *Curtin Matheson*, 494 U.S. at 786 (quoting *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 500-01 (1978) (quoting *Republic Aviation*, 324 U.S. at 798)).

[6]*See, e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 364 (1998); *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 787-88 (1996); *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94 (1995); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 891 (1984); *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 306-07 (D.C. Cir. 2003); *Lee Lumber*, 310 F.3d at 216; *Harter Tomato Prods.*, 133 F.3d at 937.

framework to the circumstances of this case. Accordingly, we deny ITT's petition for review and grant the NLRB's cross-application for enforcement.

*So ordered.*