# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 22, 2017

Lyle W. Cayce
Clerk

————————

No. 15-60848

————————

ALCOA, INCORPORATED; ALCOA COMMERCIAL WINDOWS, L.L.C.,
doing business as TRACO, a single employer,

> Petitioners Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD,

> Respondent Cross-Petitioner.

————————————

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

————————————

Before CLEMENT, PRADO, and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This Court is asked to review an order of the National Labor Relations Board ("the NLRB" or "the Board") finding that Alcoa, Inc. ("Alcoa") and its wholly owned subsidiary, Alcoa Commercial Windows, LLC d/b/a TRACO ("TRACO"), violated the National Labor Relations Act ("the NLRA" or "the Act"). Specifically, the Board determined that (1) Alcoa and TRACO (collectively, "the Companies") are a "single employer" and (2) the Companies violated Section 8(a)(1) of the Act by denying Alcoa employees access to TRACO facilities for handbilling purposes and engaging in unlawful surveillance of handbillers. The Companies petition for review of the Board's determination

No. 15-60848

that they constitute a single employer and that the single-employer doctrine can be used to hold them liable under Section 8(a)(1). The Board cross-applies for enforcement of its order.

Because substantial evidence supports the Board's finding that the Companies qualify as a single employer, and because it is reasonable and consistent with the Act to apply the single-employer doctrine to the question of liability under Section 8(a)(1), we DENY the petition for review and GRANT the Board's cross-petition for enforcement.

## I. BACKGROUND

Alcoa is a multinational corporation that mines bauxite, produces aluminum, and manufactures aluminum-related products (including windows). TRACO manufactures windows and doors. TRACO is a wholly owned subsidiary of Reynolds Metals Company ("Reynolds Metals"), which in turn is a wholly owned subsidiary of Alcoa. TRACO was acquired by Reynolds Metals in 2010 and became a part of the North American segment of Building and Construction Systems ("BCS"), a business unit of Alcoa.

In late 2010, after Alcoa purchased TRACO, TRACO employees contacted the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("the Union") about obtaining union representation. Thereafter Philip Ornot, a Union organizer, visited the TRACO facility to determine at which locations Union representatives would be permitted to handbill. Local police indicated handbilling could occur in the right-of-ways on the sides of public roads adjacent to the facility and at crosswalks between the facility and TRACO-owned parking lots.

On September 7, 2011, the Union held a conference near TRACO for Union representatives and members employed at facilities owned by Alcoa. Jim Robinson, who is employed by the Union, called Kevin O'Brien, the

director of industrial relations at Alcoa, to give him a "heads up" that Union representatives—and some Alcoa employees who were Union members—intended to handbill outside the TRACO facility the following day during a shift change. O'Brien responded that handbilling in the right-of-ways was permissible but that he would "need to get with [Alcoa] legal counsel" about handbilling in TRACO parking lots. After their conversation, O'Brien discussed the matter with two attorneys in the Alcoa legal department and called Robinson back to inform him that "those individuals who were not employees of TRACO could not enter the property, that they would need to stay on the right-of-way . . . [, and] that it would not be proper for them to go in the parking lot."

After giving Robinson this directive, O'Brien informed TRACO management of the impending union activity in a conference call with TRACO General Manager Jeff Jost, several other TRACO managers, and Alcoa attorneys. O'Brien testified that he wanted to warn Jost that there would be a large crowd outside the facility and "give him . . . advice as to what was the appropriate way to handle it." O'Brien gave Jost his phone number and instructed him that if there was a problem the next day, he could call O'Brien.

The following morning, Ornot and twenty-four conference attendees went to pass out leaflets at the TRACO facility. Brad Manzolillo, the Union's attorney, spoke with three TRACO management officials and explained that he believed several off-duty Alcoa employees who had chosen to accompany him had a right to handbill in TRACO-owned parking lots and other outside areas of the facility. Although Alcoa employees had previously been permitted to enter the facility as long as they had their IDs and clearance, TRACO management refused to allow the Alcoa employees to enter any TRACO property.

No. 15-60848

After arriving on the scene, Jost reiterated this position to Manzolillo and called O'Brien so that he could speak with the Union attorney. O'Brien told Manzolillo the Alcoa employees would not be allowed on TRACO property. When Manzolillo and the Alcoa employees crossed the street to join the rest of the group handbilling in the public right-of-way, Jost positioned himself near a group of handbillers outside the TRACO facility. As a result, any TRACO employee seeking to obtain a leaflet would have to pass by Jost. Jost remained in this position for approximately twenty to thirty minutes.

The Union filed the underlying charge in this case on September 23, 2011. Thereafter the Union amended the charge twice—once on November 23, 2011, and again on April 4, 2013. On April 18, 2013, the NLRB issued a complaint in the case alleging the Companies had violated Section 8(a)(1) of the Act in the following ways: (1) denying Alcoa employees access to the TRACO facility for handbilling purposes; (2) unlawfully surveilling handbillers; and (3) maintaining an overly broad distribution and solicitation policy. The case was tried on July 10 and 11, 2013, before Administrative Law Judge ("ALJ") Mark Carissimi.

The ALJ issued his decision on September 20, 2013, and determined that Alcoa and TRACO constitute a single employer within the meaning of the Act and thus violated Section 8(a)(1) of the Act by refusing Alcoa employees entry into the TRACO facility. He also concluded that the Companies engaged in unlawful surveillance.[1] The Companies filed their exceptions to the decision, and the NLRB General Counsel filed an answer to those exceptions. On taking these into consideration, the NLRB issued its final Decision and Order on November 16, 2015, adopting the ALJ's recommended order. The Companies

---

[1] The ALJ dismissed the final allegation—that the Companies maintained an overly broad solicitation and distribution policy—and that issue is not on appeal before this Court.

4

No. 15-60848

petitioned this Court for review of the Board's order on December 2, 2015, and the Board cross-applied for enforcement. The Union also filed a motion for leave to intervene in this appeal, which was granted.

## II. DISCUSSION

We review the NLRB's policy determinations under a deferential standard. The Supreme Court has recognized that Congress entrusted the NLRB with "the task of 'applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms.'" *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 500–01 (1978) (quoting *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945)). In other words, "the NLRB has the primary responsibility for developing and applying national labor policy," and Board rules are thus afforded "considerable deference." *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990). Accordingly, this Court will not disturb the Board's policy determination "as long as it is rational and consistent with the Act." *Trencor, Inc. v. NLRB*, 110 F.3d 268, 279 (5th Cir. 1997) (quoting *Curtin Matheson*, 494 U.S. at 787). So while the "standard of review for a question of law decided by the Board is *de novo*, . . . if the Board's construction of the statute is 'reasonably defensible,' its orders are to be enforced." *NLRB v. Motorola Inc.*, 991 F.2d 278, 282 (5th Cir. 1993) (quoting *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1314 (5th Cir. 1988)).

"When considering the [B]oard's application for enforcement, we must determine whether the underlying findings of fact are supported by substantial evidence on the record considered as a whole." *Id.*; 29 U.S.C. § 160(e). If supported by substantial evidence, the Board's findings of fact are "conclusive." 29 U.S.C. § 160(e); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). "Substantial evidence is such relevant evidence that a reasonable mind would accept to support a conclusion." *NLRB v. Allied Aviation Fueling of Dall. LP*, 490 F.3d 374, 378 (5th Cir. 2007) (internal quotation marks omitted). In

determining whether substantial evidence supports the Board's conclusion, this Court "do[es] not make credibility determinations or reweigh the evidence." *Id.* Rather, "[r]ecognizing the Board's expertise in labor law, we will defer to plausible inferences [the Board] draws from the evidence, even if we might reach a contrary result were we deciding the case de novo." *NLRB v. Thermon Heat Tracing Servs., Inc.*, 143 F.3d 181, 185 (5th Cir. 1998) (quoting *NLRB v. Turner Tool & Joint Rebuilders Corp.*, 670 F.2d 637, 641 (5th Cir. 1982)). But "in assessing whether the evidence in the record is substantial we must consider the facts that militate or detract from the NLRB's decision as well as those that support it." *Id.*

## A.     The Single-Employer Doctrine

Alcoa first argues that the Board incorrectly determined that it and TRACO constitute a single employer within the meaning of the Act. "[I]n determining the relevant employer, the Board considers several nominally separate business entities to be a single employer where they comprise an integrated enterprise." *S. Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 802 n.3 (1976) (quoting *Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile Inc.*, 380 U.S. 255, 256 (1965) (per curiam)). To determine whether several entities are a single employer within the meaning of the Act, the Board looks to four factors: (1) common ownership; (2) interrelation of operations; (3) common management; and (4) centralized control of labor relations. *Radio & Television Broad.*, 380 U.S. at 256; *NLRB v. DMR Corp.*, 699 F.2d 788, 790–91 (5th Cir. 1983). "However, no one of these factors is controlling, nor need all criteria be present. Single employer status ultimately depends on 'all the circumstances of the case' and is characterized as an absence of an 'arm's length relationship found among unintegrated companies.'" *DMR*, 699 F.2d at 791 (quoting *Local 627, Int'l Union of Operating Eng'rs v. NLRB*, 518 F.2d 1040, 1045–46 (D.C.

Cir. 1975), *aff'd in part on this issue, rev'd in part sub nom. S. Prairie Constr.*, 425 U.S. 800). But, "the factors of common control over labor relations, common management, and interrelation of operations are more critical than the factor of common ownership" and "centralized control of labor relations is of particular importance." *Oaktree Capital Mgmt., L.P. v. NLRB*, 452 F. App'x 433, 438 (5th Cir. 2011) (per curiam) (quoting *Covanta Energy Corp.*, 356 N.L.R.B. 706, 726 (2011)).

As an initial matter, both parties agree that Alcoa and TRACO share common ownership as it is undisputed that TRACO is a wholly owned subsidiary of Alcoa. *See Masland Indus., Inc.*, 311 N.L.R.B. 184, 186 (1993) ("With regard to *common ownership*, the relationship of [a] privately held corporate parent to wholly owned corporate subsidiary eliminates that issue from contention."). In addition, neither party disputes the Board's finding that the Companies do not share "common day-to-day management." *See Cimato Bros., Inc.*, 352 N.L.R.B. 797, 799 (2008). But the Companies and the NLRB disagree as to whether the remaining two factors favor finding that the Companies are a single employer under the Act. The Board based its finding that the Companies are a single employer on its determination that: (1) Alcoa and TRACO are commonly owned; (2) there is a substantial interrelationship between the two; and (3) Alcoa controls the labor relations of TRACO at a policy level. We agree. We turn now to the two disputed prongs of the single employer test: interrelation of operations and common control of labor relations.

### 1.    *Interrelation of Operations*

In determining whether two nominally separate entities have interrelated operations, the Board considers a host of factors. For instance, as it did in this case the Board can consider whether the subject entities hold themselves out to the public and employees as a single business, *Masland Indus.*, 311 N.L.R.B. at 187, and whether the two actually deal with one

No. 15-60848

another at arm's length, *Spurlino Materials, LLC*, 357 N.L.R.B. 1510, 1517 (2011). These factors are neither exclusive nor exhaustive, and they need not all come out in favor of finding interrelation for the Board to reasonably reach that conclusion. *See, e.g.*, *id.* at 1516 (determining there was an interrelation of operations even where two companies were created and licensed separately, located in different states, served different markets, had their own personnel and equipment, and kept separate financial records, credit cards, and bank accounts).

Here, substantial evidence supports the Board's finding that Alcoa and TRACO held themselves out to the public and employees as a single entity. First, Alcoa released several statements after it bought TRACO which demonstrate that the acquisition was intended to merge the businesses of both entities. When Alcoa purchased TRACO in 2010, its annual report stated that it "added to [the Alcoa] portfolio the commercial window business of Traco, which solidifies Alcoa's exterior building and construction systems offerings." In a press release discussing the purchase, Alcoa described the "combination" of businesses as expanding the "opportunities to grow [the Companies'] collective business."[2] Thereafter, Alcoa transferred all of its window and window frame manufacturing to TRACO.

Second, since 2011 the Companies held themselves out to employees and the public as a combined business through their own safety and employment materials. For example, TRACO's safety video refers to the company as "Alcoa, Traco," displays both companies' logos side by side, and cautions viewers to "abide by all Alcoa safety rules and regulations." This video is shown to all

---

[2] Although the Companies argue that these statements are describing the relationship between BCS and TRACO, not that between Alcoa and TRACO, BCS is a "business group/unit" of Alcoa. Thus the addition of TRACO to BCS is in effect the addition of TRACO to Alcoa and serves as evidence of interrelation of operations.

8

visitors to the TRACO facility. In 2012, TRACO implemented a new employee handbook. The handbook, like the video, repeatedly refers to Alcoa and its policies and describes Alcoa's position on unions. Even applications for employment at TRACO between 2011 and 2012 "had the name 'Alcoa' at the top . . . [and] also asked the question, 'Have you ever been employed by Alcoa?'"

Although the Companies argue that use of the "Alcoa" name merely shows that TRACO comes under the "brand-name umbrella" of Alcoa, there is no support for this distinction. In fact, the Board has repeatedly found that use of another entity's name is a factor in favor of finding interrelation of operations. *See, e.g.*, *Masland Indus.*, 311 N.L.R.B. at 187 (considering use of uniforms and identification cards bearing the name of another company as evidence of interrelation of operations); *Cardio Data Sys. Corp.*, 264 N.L.R.B. 37, 41 (1982) (treating the use of another company's stationery for an official communication as evidence of interrelation of operations). Thus, the repeated use of the "Alcoa" name is evidence that Alcoa and TRACO hold themselves out to the public and employees as a consolidated entity.

Third, there is some evidence suggesting that Alcoa and TRACO may not have dealt with one another at arm's length. Alcoa provides TRACO with various business services, and TRACO generally pays for these services through intercompany accounting charges. Although the Board is correct that nothing in the record establishes that TRACO generally pays Alcoa full and fair value for its services, nothing suggests the contrary either. It is clear, however, that TRACO was never charged for advice its management received from Alcoa officials in connection with the events of this case. Together with the use of intercompany accounting, TRACO's non-payment for the advice from Alcoa officials serves as some evidence that Alcoa and TRACO have interrelated operations. *See Spurlino*, 357 N.L.R.B. at 1517 (finding lack of an arm's-length relationship where related entities recorded charges on a ledger

but "d[id] not actually invoice each other" and did not charge the actual cost of some services); *Bolivar-Tees, Inc.*, 349 N.L.R.B. 720, 721 (2007), *enforced*, 551 F.3d 722 (8th Cir. 2008) ("[N]on-arm's length transactions at reduced prices or without payment entirely [are] . . . probative of interrelation of operations." (quoting *Lebanite Corp.*, 346 N.L.R.B. 748, 748 n.5 (2006))).

While the record does not show that Alcoa controls daily decisions at TRACO, in an unpublished case this Court recognized that day-to-day control of operations is not required to find that two entities are a single employer under the NLRA. *Oaktree*, 452 F. App'x at 442.[3] We find this persuasive particularly in light of the NLRB's repeated recognition that such overwhelming control is not required. *See, e.g.*, *Spurlino*, 357 N.L.R.B. at 1516 (finding interrelated operations even though the entities "were created and licensed separately, are geographically removed and serve different markets in different states, and have their own personnel and equipment"); *Royal Typewriter Co.*, 209 N.L.R.B. 1006, 1010 (1974) (concluding that operations were interrelated even though "day-to-day matters were of necessity left to the separate divisions"), *enforced*, 533 F.2d 1030 (8th Cir. 1976).

Because there is evidence that, at least in some circumstances, TRACO and Alcoa have held themselves out to the public and employees as a single business, and there is some evidence that TRACO received management services from Alcoa for which it did not pay, substantial evidence supports the Board's finding of interrelated operations.

---

[3] In support of their argument that day-to-day control is required to find single-employer status, the Companies cite *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773 (5th Cir. 1997). Although in *Lusk* this Court did note the importance of considering day-to-day control when conducting the single-employer inquiry, it only considered doing so in the context of the ADEA. *Id.* at 777. Because this case involves the NLRA, the decision in *Lusk* does not guide our analysis here.

No. 15-60848

## 2. *Common Control of Labor Relations*

In determining single-employer status, it is well recognized that the factor of "centralized control of labor relations is of particular importance." *Oaktree*, 452 F. App'x at 438 (quoting *Covanta*, 356 N.L.R.B. at 726); *accord NLRB v. O'Neill*, 965 F.2d 1522, 1529 (9th Cir. 1992); *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 26 (1st Cir. 1983). The "fundamental inquiry is whether there exists overall control of critical matters at the policy level," not whether there is control over day-to-day labor decisions. *Oaktree*, 452 F. App'x at 438, 442 (quoting *Covanta*, 356 N.L.R.B. at 726). Here, the Board concluded that the Companies share centralized control of labor relations.[4] We agree.

The trainings and materials given by Alcoa to TRACO support a finding of common control of labor relations. Although TRACO paid for this information, payment alone is not enough to establish independence of the two entities with respect to their labor policies. *See Covanta*, 356 N.L.R.B. at 727. The fact that the Companies characterize the information as "advice" that TRACO officials were "not required to follow" or "even receive . . . at all," does not mean, as the Companies urge, that TRACO's labor relations are totally independent of Alcoa's for the purpose of the single-employer inquiry, *see Pathology Inst., Inc.*, 320 NLRB 1050, 1059 (1996) ("[I]t is the *existence* of interrelat[ion], not a *compulsion* to be interrelated, that is the material consideration."), *enforced*, 116 F.3d 482 (9th Cir. 1997). And regardless of any requirement that TRACO follow Alcoa's guidance, or lack thereof, Alcoa's policy with regard to unions was also clearly presented in the TRACO employee

---

[4] The Board's decision was primarily based on: (1) a daylong training Alcoa provided to TRACO managers, which included information about keeping the facility free of unions; (2) an instance where O'Brien gave instructions to TRACO management about the steps to take if union literature were found at TRACO; (3) material the Alcoa labor relations department gave to TRACO management following the handbilling incident; and (4) O'Brien's alleged direct involvement in the incidents involved in this case.

handbook. This demonstrates that TRACO adopted Alcoa's policy as its own, and moreover, as the events leading up to this case show, that Alcoa *did actually control* certain aspects of TRACO's labor policy.

Particularly, O'Brien's communications with the Union and his direction of TRACO management reveal such actual control. Although it appears that Robinson, a representative of the Union, initially called O'Brien because the two had a preexisting relationship, O'Brien made no attempt to refer him to TRACO. Rather, O'Brien consulted with Alcoa legal counsel about whether it would be proper for Union representatives to handbill on or near the TRACO property without ever informing TRACO. In fact, O'Brien did not even initially report the advice from legal counsel to TRACO management. Instead, he simply informed Robinson that "individuals who were not employees of TRACO . . . would need to stay on the right-of-way" when handbilling. In other words, O'Brien, an Alcoa employee, made the ultimate decision as to whether and where handbilling would be permitted at TRACO. Only after making the decision himself did O'Brien call TRACO to inform management about the imminent union activity and how management should deal with it. In O'Brien's own words, his "purpose in calling Mr. Jost was to first and foremost make sure there was no incident, that the matter would be handled appropriately the next day." Such involvement in the underlying decision-making process that resulted in the alleged unfair labor practices is probative of centralized control of labor relations and single-employer status. *See Oaktree*, 452 F. App'x at 441–42 (finding that the involvement of a corporate owner of a resort in the "underlying incidents" giving rise to the litigation was evidence of centralized control of labor relations); *Royal Typewriter*, 209 N.L.R.B. at 1010–11 (determining that labor relations were commonly controlled where there was "extensive participation by officials of Litton Industries in the conduct alleged . . . to constitute unfair labor practices").

In sum, because there is substantial evidence showing common control over labor relations as well as interrelation of operations and common ownership, we hold the Board correctly determined that Alcoa and TRACO constitute a single employer.

## B.    Violation of Section 8(a)(1) of the NLRA

After concluding that Alcoa and TRACO constitute a single employer under the NLRA, the Board determined that the Companies had violated Section 8(a)(1) of the NLRA by (1) excluding Alcoa employees from the TRACO facility and (2) unlawfully surveilling handbilling activities. Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by Section 7 of the Act. 29 U.S.C. § 158. Section 7, in turn, gives employees the "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. In fact, "the right to organize is at the very core of the purpose for which the NLRA was enacted." *Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*, 436 U.S. 180, 206 n.42 (1978). And this right "necessarily encompasses the right . . . to communicate with one another regarding self-organization at the jobsite." *Beth Israel*, 437 U.S. at 491. We address the violations found by the Board in turn.

### 1.    *Exclusion of Alcoa Employees from the TRACO Facility*

The Board first found that the exclusion of Alcoa employees from the TRACO facility violated Section 8(a)(1) of the Act. It is well-established that the Act permits employees to engage in protected union organizing activities during nonworking time. *Republic Aviation*, 324 U.S. at 803–04 & n.10. Among other things, Section 8(a)(1) protects "off-duty employees engaging in Section 7 activity in outside nonworking areas of their employer's facilities." *Hillhaven*

No. 15-60848

*Highland House*, 336 N.L.R.B. 646, 647 (2001), *enforced*, 344 F.3d 523 (6th Cir. 2003); *accord ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 999–1000 (D.C. Cir. 2001). This includes union activity employees engage in at their employer's facilities "other than where they work[]." *Hillhaven*, 336 N.L.R.B. at 647; *accord ITT Indus., Inc. v. NLRB*, 413 F.3d 64, 70–71 (D.C. Cir. 2005). In *Hillhaven*, the Board explained that offsite employees are "'employees' in the narrow sense"—that "[w]hen an offsite employee seeks to encourage the organization of similarly situated employees at another employer facility, the employee seeks to further his own welfare." 336 N.L.R.B. at 648; *accord ITT Indus.*, 413 F.3d at 70–71. "In attempting to organize the unorganized, employees seek strength in numbers to increase the power of their union and ultimately to improve their own working conditions." *Hillhaven*, 336 N.L.R.B. at 648 (citing *United Food & Commercial Workers Locals 951, 7 & 1036* (*Meijer, Inc.*), 329 N.L.R.B. 730, 734 (1999)); *accord ITT Indus.*, 413 F.3d at 71. Thus, these rights are "personal rather than derivative." *ITT Indus.*, 413 F.3d at 71.

On the other hand, the Board recognizes that this derivative right of an offsite employee must be balanced against the employer's property and managerial interests. *Hillhaven*, 336 N.L.R.B. at 650; *accord ITT Indus.*, 413 F.3d at 72 (describing the "inherent tension" between these interests (quoting *Hillhaven*, 336 N.L.R.B. at 650)). In balancing employee–employer interests the Board considers, for instance, the potential that "an influx of offsite employees might raise security problems, traffic control problems, or other difficulties that might well justify an employer's restriction (or even prohibition) of such access." *Hillhaven*, 336 N.L.R.B. at 650; *accord ITT Indus.*, 413 F.3d at 73. But at the same time, the Board cautions "that an employer must demonstrate why its security needs or related business justifications warrant restrictions on access by offsite visiting employees." *Hillhaven*, 336 N.L.R.B. at 650; *accord ITT Indus.*, 413 F.3d at 73.

14

No. 15-60848

Here, the Board applied the test from *Hillhaven* to the context of the single-employer relationship. In its decision, the Board recognized that "no prior Board precedent . . . expressly holds that the employees of one entity that comprises part of a single employer have a right of access to the exterior areas of the plant of another entity that is also part of the single employer for purposes of organizational handbilling." However, it concluded that such a decision would be reasonable in light of the Board's prior opinion in *Mine Workers* (*Boich Mining Co.*), 301 N.L.R.B. 872 (1991). We agree.

In *Boich*, the Board determined that two wholly owned subsidiaries of a holding company constituted a single employer. *Id.* at 872. As a result, it concluded that the employees of one subsidiary could strike against the other subsidiary pursuant to Section 8(b)(4)(B) of the NLRA. *Id.* In applying the single-employer doctrine in the context of Section 8(b)(4)(B), the Board looked to the purpose of that part of the statute: "[T]o preserve the traditional right of striking employees to bring pressure against employers who are substantially involved in their dispute, while protecting neutral employers from being enmeshed in it." *Id.* at 873 (quoting *Curtin Matheson Sci., Inc.*, 248 N.L.R.B. 1212, 1212–13 (1980)). Because the purpose of the statute focused on the neutrality of an employer with respect to a labor dispute, and since the Board determined the two subsidiaries were so intertwined as to be a single employer, the Board found it consistent to apply the single-employer doctrine to Section 8(b)(4)(B). *Id.* at 875. Two intertwined subsidiaries, in essence, could not be neutral with respect to each other's labor disputes.

Likewise, applying the single-employer doctrine to the question of liability under Section 8(a)(1) is consistent with its purpose. In discussing why Section 8(a)(1) rights apply to offsite employees, both *Hillhaven* and *ITT* stress the idea that similarly situated employees (even at different facilities) derive strength in numbers because together they can collectively push for better

15

working conditions. *ITT Indus.*, 413 F.3d at 70–71; *Hillhaven*, 336 N.L.R.B. at 648. Thus, the question in determining consistency with the statute is really whether applying the single-employer doctrine in this context serves to protect employees' rights to collectively pressure their employer. We hold that it does. When two entities qualify as a single employer, a court, among other things, considers whether the two entities share common control at a "policy level"— including over labor relations. If there exists such a degree of common control and interrelation, it follows that collective action efforts, like those involved in this case, would help employees exert pressure on that common source of labor policy. Thus, applying the single-employer doctrine in this context is consistent with the purpose of Section 8(a)(1). *See Trencor*, 110 F.3d at 279 (stating that this Court will not disturb the Board's policy determination unless it is unreasonable or inconsistent with the Act). Accordingly, we find this application proper.

Barring their objection to application of the single-employer doctrine in this case, the Companies do not dispute that substantial evidence supports the Board's finding that the Companies violated Section 8(a)(1) by denying Alcoa employees access to TRACO facilities for handbilling purposes. Therefore, we will summarily enforce the Board's order with respect to liability under Section 8(a)(1) on this issue. *See Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 429 (5th Cir. 2008) ("[W]hen an employer does not challenge a finding of the Board, the unchallenged issue is waived on appeal, entitling the Board to summary enforcement.").

### 2.   *Surveillance of Handbilling*

The Board also determined that the Companies violated Section 8(a)(1) of the Act by unlawfully surveilling union activity. It is undisputed that TRACO General Manager Jost positioned himself outside the TRACO facility near union handbillers so that he could see which TRACO employees accepted

handbills. Nor is the Board's finding that this was out of the ordinary contested. This sort of observation constitutes unlawful surveillance under the Act. *See NLRB v. Aero Corp.*, 581 F.2d 511, 512–13 (5th Cir. 1978) (determining that a supervisor's observation of his employees' union activity in a public park was unlawful surveillance); *Aladdin Gaming, LLC*, 345 N.L.R.B. 585, 585–86 (2005) (finding observation of employees' union activities unlawful where it is out of the ordinary). Because the Companies do not challenge this finding, we likewise summarily enforce the Board's order on the issue of unlawful surveillance. *See Sara Lee Bakery Grp.*, 514 F.3d at 429.

## III. CONCLUSION

For the foregoing reasons, the Companies' petition for review is DENIED, and the Board's cross-application for enforcement is GRANTED.