RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0068p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

NATIONAL LABOR RELATIONS BOARD,

        *Petitioner/Cross-Respondent*,

    *v.*

BANNUM PLACE OF SAGINAW, LLC; BANNUM, INC.

        *Respondents/Cross-Petitioners*.

    Nos. 23-1632/1695

On Petition for Review and Cross Application for Enforcement
of an Order of the National Labor Relations Board.
Nos. 07-CA-207685; 07-CA-211090; 07-CA-215356.

Decided and Filed: March 28, 2024

Before: MOORE, COLE, and NALBANDIAN, Circuit Judges.

─────────────────

**COUNSEL**

─────────────────

**ON BRIEF:** Frank T. Mamat, DINSMORE & SHOHL LLP, Troy, Michigan for Bannum.
Usha Dheenan, Joel A. Heller, Ruth E. Burdick, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for the National Labor Relations Board.

─────────────────

**OPINION**

─────────────────

KAREN NELSON MOORE, Circuit Judge. In a previous proceeding, we enforced a
National Labor Relations Board Order finding that respondent Bannum Place of Saginaw, LLC
engaged in unfair labor practices in violation of 29 U.S.C. § 158(a)(1), (3), and (4) when it
interrogated employees, threatened to close its facility, and terminated two union supporters.
The National Labor Relations Board now seeks to enforce its supplemental decision and order

directing Respondents to pay specific backpay amounts to the two discriminatees, and Respondents petition for review of the supplemental decision and order. For the reasons that follow, we **GRANT** the National Labor Relations Board's application for enforcement and **DENY** Respondents' cross-petition.

## I.  BACKGROUND

### A.  Unfair Labor Practice Proceedings

Bannum Place of Saginaw, LLC ("Bannum Saginaw") operated and ran reentry services for formerly incarcerated individuals in Saginaw, Michigan. *See Bannum Place of Saginaw, LLC v. NLRB*, 41 F.4th 518, 522 (6th Cir. 2022). Bannum, Inc., an affiliated entity, held a contract with the Bureau of Prisons for which Bannum Saginaw provided services. *Bannum Place of Saginaw, LLC and Bannum, Inc.*, 372 NLRB No. 97, slip op. at 2–3 (June 27, 2023).

In 2017, Bannum Saginaw employees voted to unionize their workplace. *Bannum*, 41 F.4th at 522. Bannum Saginaw's conduct both before and after the representation election, however, led an employee and the union to file unfair labor practice charges against Bannum Saginaw. *Id.* The charges alleged that Bannum Saginaw tried to dissuade its employees from supporting unionization by "interrogat[ing] employees about their views on unions, threaten[ing] reprisals if they voted for the Union, and discharg[ing] known supporters of the Union." *Id.* Bannum Saginaw terminated employees Greg Price and Ernie Ahmad, both union supporters. *Bannum*, 372 NLRB No. 97, slip op. at 4.

In February and March 2020, an unfair labor practice hearing was held before an administrative law judge. *Bannum Place of Saginaw, LLC*, 370 NLRB No. 117, slip op. at 11 (Apr. 30, 2021). Bannum Saginaw was the sole respondent. *Id.* The administrative law judge found that Bannum Saginaw violated the National Labor Relations Act, including by the "discriminatory termination of Price . . . and Ahmad." *Bannum*, 372 NLRB No. 97, slip op. at 4. In April 2021, the National Labor Relations Board ("the Board")[1] issued a decision and order unanimously adopting most of the administrative law judge's conclusions, and finding that

---

[1]For the sake of clarity, we refer to the National Labor Relations Board, when serving in its adjudicative function, as "the Board." We otherwise refer to it as "the NLRB."

Bannum Saginaw committed unfair labor practices when it discharged Price and Ahmad. *Bannum*, 370 NLRB No. 117, slip op. at 1.  The Board ordered Bannum Saginaw to reinstate Price and Ahmad and to make them whole for the earnings and benefits they lost because of Bannum Saginaw's unlawful acts.  *Id.* at 8.  In July 2022, we granted the NLRB's application to enforce the order.[2]  *Bannum Place*, 41 F.4th at 530.

## B.  Compliance Proceedings

On November 4, 2021, while appellate proceedings were pending, the NLRB issued a Compliance Specification and Notice of Hearing to Bannum Saginaw.  *Bannum*, 372 NLRB No. 97, slip op. at 5.  On March 31, 2022, the NLRB issued an amended Compliance Specification and Notice of Hearing, this time to both Bannum Saginaw and Bannum, Inc. as the parent, single, and/or joint employer of Bannum Saginaw.  *Id.*  On July 20, 2022, a compliance hearing was held before Administrative Law Judge Sharon Levinson Steckler.  *Id.* at 2.  Bannum Saginaw and Bannum, Inc. (collectively "Bannum" or "Respondents") were represented by joint counsel at the hearing.  *See* D. 27 (Compliance Hr'g Tr. at 10–11, 21) (6th Cir. Aug. 21, 2023).[3] Administrative Law Judge Steckler issued a Supplemental Decision on October 14, 2022, and the Board adopted the decision, with slight modifications, on June 27, 2023.  *Bannum*, 372 NLRB No. 97, slip op. at 1.  The Board's Supplemental Decision and Order ordered "the Respondents, Bannum Place of Saginaw, LLC and Bannum, Inc., . . . a parent and/or single employer, and their officers, agents, successors, and assigns" to make whole both Greg Price and Ernie Ahmad.  *Id.*  It specifically ordered Respondents to:

1. Make whole Greg Price by paying him backpay in the amount of $26,974, plus $25,458.53 to compensate him for 401(k) contributions and expenses, and $3,325 to compensate him for medical expenses, plus interest accrued to the date of payment as prescribed in *New Horizons*, 283 NLRB 1173 (1987),

---

[2]Nearly one year after our enforcement of that order, the NLRB filed a motion in this court for a protective restraining order against Bannum Saginaw and Bannum, Inc.  *See NLRB v. Bannum, Inc.*, Nos. 21-2664/2690, 2023 WL 4842837, at *2 (6th Cir. July 27, 2023) (order) (per curiam).  We granted the NLRB's motion and issued a protective restraining order.  *Id.* at *3.  On January 22, 2024, the NLRB filed a motion to adjudicate Bannum Saginaw and Bannum, Inc. in civil contempt of the protective restraining order and, on February 23, 2024, we granted that motion.  *NLRB v. Bannum, Inc.*, 93 F.4th 973, 979, 984 (6th Cir. 2024) (per curiam).  For a more extensive discussion of this procedural history, *see id.* at 976–79.

[3]Docket numbers are from No. 23-1632 unless otherwise noted.

compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010), minus tax withholdings on the backpay as required by Federal and State laws.

2. Make whole Ernie Ahmad by paying him backpay in the amount of $28,741, plus $27,978 to compensate him for 401(k) contributions and expenses, plus interest accrued to the date of payment as prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra, minus tax withholdings on the backpay as required by Federal and State laws.

3. Make whole Greg Price and Ernie Ahmad for the adverse tax consequences of receiving lump-sum backpay awards.

*Id.*

## C. The Board's Factual Findings

The Board's Supplemental Decision and Order affirmed the administrative law judge's findings that Bannum, Inc. and Bannum Saginaw were a single employer and that Bannum, Inc. was the parent company of Bannum Saginaw. *Id.* at 1, 9. In making that determination, the Board found several connections between Bannum, Inc. and Bannum Saginaw.[4] Specifically, the Board found that John Rich served as President and corporate counsel of both Bannum, Inc. and Bannum Saginaw. *Id.* at 3. Sandra Allen, Bannum, Inc. Vice President, handled Bannum Saginaw's payroll, signed paychecks issued to its employees, and approved of discipline for Bannum Saginaw employees. *Id.* Katrina Teel, Bannum, Inc. Compliance Manager, visited Bannum Saginaw to audit the program, and she directed disciplinary action and trained, hired, and fired Bannum Saginaw employees. *Id.* Bannum, Inc. provided job descriptions and an employee handbook to Bannum Saginaw. *Id.* at 3–4. Bannum Saginaw employees' paychecks and W-2 forms listed the Bannum, Inc. address. *Id.* at 3. When Bannum Saginaw stopped employing a manager, Bannum, Inc. employees, including Teel, filled in. *Id.*

As described above, the Board specifically ordered Bannum to pay backpay, 401(k) contributions and expenses, and interest, as well as to address the adverse tax consequences of lump-sum backpay awards to both Price and Ahmad. *Id.* at 1. The Board also ordered Bannum

---

[4]We treat Administrative Law Judge Steckler's findings as the Board's findings because the Board affirmed them. *Bannum*, 372 NLRB No. 97, slip op. at 1. Bannum asserts that "Bannum Saginaw provided all day-to-day supervision of its employees," D. 41 (Resp't Br. at 16) (6th Cir. Nov. 29, 2023), but it does not contest the Board's specific findings as to the role Bannum, Inc. employees played at Bannum Saginaw.

to compensate Price for medical expenses.  *Id.*  In determining this backpay award, the Board found that the backpay period ran from each discriminatee's date of termination to September 30, 2021, the date Bannum Saginaw closed.  *Id.* at 13.

As for Price, the Board found that "Respondents unlawfully terminated Price on September 28, 2017."  *Id.* at 14.  Following Price's termination, he sought employment at various criminal-justice facilities in the area, had several interviews, and began working a third-shift job.  *Id.*  Price did not retain his new employment, however; Price left that third-shift job because it interfered with his ability to attend college classes to complete his bachelor's degree.  *Id.*  Price was not a third-shift employee at Bannum Saginaw and had been taking college courses prior to his termination from Bannum Saginaw.  *Id.*  Price obtained a new position in November 2018 in which he earned more than he did at Bannum Saginaw.  *Id.*  The Board found that "Respondents unlawfully terminated Ahmad on November 21, 2017."  *Id.* at 15.  Ahmad searched for work through 2018 but was not able to find any jobs "commensurate with his prior work."  *Id.*  In the interim, Ahmad worked full-time, and for additional part-time hours, for the Saginaw County Mental Health Authority.  *Id.*  "After 2020, Ahmad completely offset backpay owed."  *Id.*

On July 11, 2023, the NLRB filed an application for enforcement of the June 27, 2023, Supplemental Decision and Order, D. 1 (Enforcement Appl.) (6th Cir. July 11, 2023), and on August 3, 3023, Bannum petitioned for review of the Supplemental Decision and Order, D. 1 (Pet. Rev.) (6th Cir. Aug. 3, 2023) (No. 23-1695).

## II. ANALYSIS

We have jurisdiction under 29 U.S.C. § 160(e) and (f) to review applications for enforcement and petitions to review final orders of the National Labor Relations Board.  Bannum argues that we should not enforce the order because (1) the Board erred in finding that Bannum, Inc. and Bannum Place of Saginaw, LLC are a single employer, (2) the Board violated Bannum, Inc.'s due-process rights, (3) the Board erred in calculating the damages owed, and (4) the Board erroneously imposed an adverse inference against Bannum.  Bannum's arguments are unpersuasive.

**A.  Single Employer and/or Parent Company**

The Board found "that Bannum, Inc. is both the parent of Bannum Saginaw and a single employer with Bannum Saginaw." *Bannum*, 372 NLRB No. 97, slip op. at 9.  "As a result of these findings, [the Board] decline[d] to reach the issue of joint employer [status] between Bannum, Inc. and Bannum Saginaw." *Id.*  In the compliance proceedings, however, Bannum's "briefs ignore[d] the separate issues of whether Bannum[,] Inc. was the parent or the single employer.  It instead argue[d] that Bannum, Inc. was not a joint employer . . . ." *Id.* at 9 n.18. Likewise, here, Bannum argues that Bannum, Inc. and Bannum Saginaw are not joint employers—and that the Board, accordingly, erred in imposing joint-employer status on Respondents.  D. 41 (Resp't Br. at 13–16) (6th Cir. Nov. 29, 2023).  Bannum, however, again "ignore[s] the separate issues of whether Bannum[,] Inc. was the parent or the single employer." *Bannum*, 372 NLRB No. 97, slip op. at 9 n.18; *see* D. 41 (Resp't Br. at 13–16) (6th Cir. Nov. 29, 2023).

Joint-employer status is distinct from single-employer status or parent-company status. *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997).[5] Respondents' argument that Bannum, Inc. and Bannum Saginaw are not joint employers is, accordingly, inapposite.  Because the Board made no finding as to the possible joint-employer status of the two entities, we too decline to address that argument.

We first review the argument that the Board erred in finding that Bannum, Inc. and Bannum Saginaw constitute a single employer.  We will uphold the Board's single employer finding if it is supported by substantial evidence in the record.  *NLRB v. Palmer Donavin Mfg. Co.*, 369 F.3d 954, 957 (6th Cir. 2004).  A single-employer analysis asks whether "two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise." *Swallows*, 128 F.3d at 993 n.4.  Single-employer status "is characterized as an absence of an 'arm's length relationship found among unintegrated companies.'" *Alcoa, Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017) (quoting *NLRB v. DMR Corp.*, 699 F.2d 788, 791

---

[5]Though *Swallows* is an age and disability discrimination case, the "'single employer' . . . concept[ was] developed in the labor relations context, and . . . subsequently imported into the civil rights context." *Swallows*, 128 F.3d at 993 n.3 (citations omitted).  We therefore "look to both labor cases and civil rights cases for guidance." *Id.*

(5th Cir. 1983)).  To determine if two entities are a single employer for purposes of the National Labor Relations Act, we consider whether the two entities have "(1) common ownership, (2) common management, (3) centralized control of labor relations, and (4) interrelation of operations." *Palmer Donavin*, 369 F.3d at 957.  "None of these factors is conclusive, and all four need not be met in every case." *Swallows*, 128 F.3d at 994.  The third factor, centralized control over labor relations, however, "is a central concern." *Id.*; *see also Alcoa, Inc.*, 849 F.3d at 256.

All four factors support the finding that Respondents are a single employer.  Looking first to common ownership, "the relationship of privately held corporate parent to wholly owned corporate subsidiary eliminates that issue from contention." *Masland Indus., Inc.*, 311 NLRB 184, 186 (1993).  Stated otherwise, when one entity is a wholly owned subsidiary of another entity, common ownership is established.  It is uncontested that Bannum Saginaw is a wholly owned subsidiary of Bannum, Inc.  *Bannum*, 372 NLRB No. 97, slip op. at 3 ("At the unfair labor practice case hearing[,] Rich[, the Bannum President,] admitted that Bannum, Inc. was the parent company of Bannum Saginaw.").  The common-ownership factor accordingly favors a finding that Respondents are a single employer.

The second factor, common management, can be demonstrated by "substantial overlap in management and officers of the Respondents." *Palmer Donavin*, 369 F.3d at 957; *see also McKinney v. Carlton Manor Nursing & Rehab. Ctr., Inc.*, 868 F.3d 461, 464 (6th Cir. 2017) (considering whether the entities "share any directors or officers").  As the Board noted, "Bannum, Inc. and Bannum Saginaw had almost identical officers." *Bannum*, 372 NLRB No. 97, slip op. at 10.  Respondents' common management ran deep:

> Beyond the day-to-day management by the onsite manager/director, much of the supervision and direction came from Katrina Teel, checking compliance, hiring, and training employees, and Sandra Allen, for pay.  Disciplinary decisions were not made at the onsite level; Teel and Allen determined whether discipline would be given.  In the case of the two terminations in this case, Rich was responsible [for] making the order.  The president of both entities, Rich, in conjunction with Bannum, Inc.'s officers Teel and Allen determined to terminate the discriminatees.

*Id.*  The second factor, accordingly, favors a finding that Respondents are a single employer.

The third factor, centralized control of labor relations, also favors a single-employer finding. To analyze whether separate entities have centralized control of labor relations, courts have considered whether one entity had hiring and firing power over the other entity's employees, *Swallows*, 128 F.3d at 995, whether the entities had conjoined payrolls, and whether they shared personnel policies, *McKinney*, 868 F.3d at 464; *see also Palmer Donavin*, 369 F.3d at 957. Each of these considerations indicate that Respondents had centralized control of labor relations. Bannum, Inc. Compliance Manager Teel had hiring and firing power over Bannum Saginaw employees; Bannum Saginaw employees' paychecks listed the Bannum, Inc. mailing address; and Bannum, Inc. provided job descriptions and an employee handbook to Bannum Saginaw. *Bannum*, 372 NLRB No. 97, slip op. at 3, 10. Respondents, accordingly, had centralized control of labor relations.

Finally, the fourth factor, interrelation of operations, also weighs in favor of single-employer status. In *Palmer Donavin*, we held that two entities had interrelated operations, thus providing substantial evidence to support a single employer finding when the two entities "operate[d] from the same facility, ha[d] the same health, life insurance and profit-sharing plans, use[d] the same payroll system, enjoy[ed] the same work holidays, and the Respondents' employees occasionally fill[ed] in for each other." *Palmer Donavin*, 369 F.3d at 957. The facts here resemble the facts in *Palmer Donavin*. Bannum, Inc. owned the facility in which Bannum Saginaw was run; employees' paychecks and W-2 forms reflected Bannum, Inc.'s address; Bannum, Inc. ran the payroll system for Bannum Saginaw employees; Bannum, Inc. facilitated Bannum Saginaw's insurance and retirement plans; and Bannum, Inc. managers filled in for Bannum Saginaw. *Bannum*, 372 NLRB No. 97, slip op. at 3, 10. Respondents' operations are deeply interrelated. The Board's finding that Respondents constitute a single employer is supported by all four relevant factors. Single-employer status is thus supported by substantial evidence in the record.

In addition to single-employer status, the Board also found "that Bannum, Inc., as the parent company of its subsidiary Bannum Saginaw, is also liable for directly participating in the unfair labor practices." *Id.* at 10. "For a parent to be liable for the unfair labor practices of its subsidiary, there must be a showing of the parent's 'direct participation' in the unlawful

conduct." *Wyndham Int'l, Inc.*, 330 NLRB 691, 693 (2000) (quoting *Swift Ind. Corp.*, 289 NLRB 423, 429 (1988); *Esmark, Inc.*, 315 NLRB 763, 767 (1994)). Because we find that Respondents are liable as a single employer, however, we need not—and decline to—reach the issue of whether Bannum, Inc. is additionally liable as a parent company that directly participated in unlawful conduct.

**B. Due Process**

As noted above, this case involves a supplemental compliance proceeding before the National Labor Relations Board. At the unfair labor practice hearing, Bannum Saginaw was the lone respondent. *Bannum*, 370 NLRB No. 117, slip op. at 1. On March 31, 2022, however, the NLRB issued a Compliance Specification and Notice of Hearing that named both Bannum Saginaw and Bannum, Inc. as respondents. *Bannum*, 372 NLRB No. 97, slip op. at 5. Both Bannum Saginaw and Bannum, Inc. were then held liable and ordered to make whole the discriminatees in this case. *Id.* at 1. Respondents now argue that "the Board deprived Bannum[, Inc.] of due process every step of the way, [because] Bannum Saginaw was the only employer named in the underlying proceedings [and] Bannum Saginaw was the only employer that received notice of the assertions raised in 2017—until 2022." D. 41 (Resp't Br. at 20) (6th Cir. Nov. 29, 2023). Bannum further argues that, because the Board "notif[ied] Bannum[, Inc.] so late, the Board deprived [it] of the opportunity to participate in the proceedings at a time when it might have defended itself *before* the outcome was determined," thus depriving it of due process. *Id.*

"It is well established that liability for backpay . . . may be imposed upon a party to a supplemental proceeding, even though he had not been a party to the proceeding in which the unfair labor practices were found, if he was sufficiently closely related to the party found to have committed the unfair labor practices." *Coast Delivery Serv., Inc.*, 198 NLRB 1026, 1027 (1972); *see also Associated Gen. Contractors of Conn., Inc. v. NLRB*, 929 F.2d 910, 913 (2d Cir. 1991); *NLRB v. Resisteflame Acquisition Co.*, No. 1:11-MC-00046, 2012 WL 3966295 (S.D. Ohio Sept. 11, 2012), *report and recommendation adopted*, No. 1:11-CV-00046, 2012 WL 4808463 (S.D. Ohio Oct. 10, 2012). If two parties constitute a single employer, they are "sufficiently closely related." *Coast Delivery Serv.*, 198 NLRB at 1027; *see also Resisteflame*, 2012 WL 3966295,

at *2; *Associated Gen. Contractors*, 929 F.2d at 911 ("[D]erivative liability may be imposed in a supplemental compliance proceeding only on the more demanding showing of an alter ego, successor, or single employer status."). Stated otherwise: When two entities constitute a single employer, both entities may be held liable for backpay so long as *one* of the entities was a party to the unfair labor practice proceeding.

Because Bannum, Inc. and Bannum Saginaw have been adjudged a single employer, Respondents' argument that holding Bannum, Inc. liable violates its due-process rights is unpersuasive. "The exceedingly close relationship of . . . single employer status provides assurance that the proceeding against the original party was equivalent to a proceeding against the newly added party." *Associated Gen. Contractors*, 929 F.2d at 914; *see also Viking Indus. Sec., Inc. v. NLRB*, 225 F.3d 131, 135 (2d Cir. 2000) ("Because the businesses that compose a 'single employer' are deemed to have identical interests, the representation of the interests of one of them at the unfair labor practice hearing amounts to representation of both for the purposes of due process."). Bannum, Inc., accordingly, received notice and an opportunity to be heard by virtue of its single-employer relationship with Bannum Saginaw, which indisputably received notice and an opportunity to be heard. *See NLRB v. Int'l Measurement & Control Co.*, 978 F.2d 334, 337 (7th Cir. 1992) ("If, as the Board found, the [entities] are but a single employer, then notice to one was notice to all.").

## C. Backpay

Upon a finding of an unfair labor practice, the Board's remedial "power is a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964). "We may not disturb the Board's back pay order 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [National Labor Relations] Act.'" *Lou's Transp., Inc. v. NLRB*, 945 F.3d 1012, 1018 (6th Cir. 2019) (quoting *NLRB v. Overseas Motors, Inc.*, 818 F.2d 517, 520 (6th Cir. 1987)). Accordingly, we will disturb the Board's remedial order only if it has abused its discretion. *NLRB v. Jackson Hosp. Corp.*, 557 F.3d 301, 306 (6th Cir. 2009).

Bannum argues that the Board "adopted an erroneous calculation of backpay." D. 41 (Resp't Br. at 9) (6th Cir. Nov. 29, 2023). Though the NLRB bears the burden of demonstrating the gross amount of backpay owed to a discriminatee, "the burden is upon the *employer* to establish facts which would negative the existence of liability to a given employee or which would mitigate that liability." *Overseas Motors*, 818 F.2d at 521 (quoting *NLRB v. Reynolds*, 399 F.2d 668, 669 (6th Cir. 1968)). The Board's conclusion that an employer has not met this burden "will be overturned on appeal only if the record, considered in its entirety, does not disclose substantial evidence to support the Board's findings." *Jackson Hosp. Corp.*, 557 F.3d at 307 (quoting *NLRB v. Westin Hotel*, 758 F.2d 1126, 1130 (6th Cir. 1985)).

### 1. Greg Price

Bannum argues that Price's backpay award was erroneously inflated because the Board "disregard[ed] Price's failure to mitigate his losses." D. 41 (Resp't Br. at 18) (6th Cir. Nov. 29, 2023). Specifically, Bannum argues that "any award of backpay to Price should have terminated upon his voluntary withdrawal from the workforce." *Id.* at 19. Bannum does not challenge the Board's gross-backpay calculations, but rather it merely argues that Price's failure sufficiently to mitigate his damages should have tolled his backpay award. *Id.* at 18–19.

Bannum is correct that a discriminatee must mitigate their damages. "The general rule in labor cases is that 'an employee must at least make reasonable efforts to find new employment which is substantially equivalent to the position [lost] . . . and is suitable to a person of his background and experience.'" *Westin Hotel*, 758 F.2d at 1130 (alterations in original) (quoting *Heheman v. E. W. Scripps Co.*, 661 F.2d 1115, 1125 (6th Cir. 1981)). Stated otherwise, for a discriminatee sufficiently to mitigate their damages, "all that is required is a reasonable effort to search" for substantially equivalent employment. *Jackson Hosp. Corp.*, 557 F.3d at 308. This standard "'is not onerous,'" and "the burden remains on the employer to prove that the employee failed to mitigate [his] damages." *Id.* (quoting *Westin Hotel*, 758 F.2d at 1130); *see also Westin Hotel*, 758 F.2d at 1130 ("[A] wrongfully-discharged employee . . . is not held to the highest standard of diligence.").

Following his termination, Price sought employment at various criminal-justice facilities, had several interviews, and began working a third-shift job. *Bannum*, 372 NLRB No. 97, slip op. at 14. When the new, third-shift job began interfering with Price's ability to attend his college classes, however, he left the job. *Id.* While working at Bannum Saginaw, Price was also taking college courses, but he did not work the third shift at Bannum Saginaw and that position did not interfere with his classes. *Id.* In *NLRB v. Jackson Hospital Corp.*, an employee whom Jackson Hospital had unlawfully terminated found new employment at a Rite-Aid store. 557 F.3d at 307–08. When the Rite-Aid manager, however, informed the employee that she would need to transfer to a work location "roughly seventy miles away," the employee left the job. *Id.* at 307. We held that, "although [she] 'willfully' left her job at Rite-Aid, an unlawfully laid-off employee is not required to accept or remain in less desirable working conditions." *Id.* at 308. Because refusing to stay in a job that would have required her to drive "seventy miles each way to get to and from work" was reasonable, leaving that job did not toll her backpay. *Id.*

Like the employee in *Jackson Hospital*, Price took reasonable steps to locate new employment. When that new job proved to have "less desirable working conditions" than his Bannum Saginaw job, however, he reasonably left that employment. *Id.* The duty to mitigate requires only a reasonable effort to find substantially equivalent employment. *See Westin Hotel*, 758 F.2d at 1130. Just as it was reasonable for the Jackson Hospital employee to leave a job that would require a 70-mile commute, it was reasonable for Price to leave a job that was on the third shift and interfered with his education. As the NLRB correctly argues, "[a] discharged employee need not retain interim employment that 'create[s] unacceptable disruptions to the discriminatee's private life,' and quitting such a position 'does not . . . reduce the discriminatee's backpay.'" D. 45 (Pet'r Br. at 16–17) (6th Cir. Feb. 6, 2024) (quoting *United States Can Co.*, 328 NLRB 334, 346 (1999), *enforced*, 254 F.3d 626 (7th Cir. 2001)). Price was "not required to accept or remain in less desirable working conditions." *Jackson Hosp. Corp.*, 557 F.3d at 308. Bannum has, accordingly, not met its burden of demonstrating that Price's backpay award should be diminished.

**2. Ernie Ahmad**

Bannum argues that the Board's award of backpay to Ahmad was erroneous because Ahmad's "entitlement to backpay . . . ceased in January 2018, when he abandoned his job search." D. 41 (Resp't Br. at 18) (6th Cir. Nov. 29, 2023). Bannum does not challenge the Board's gross-backpay calculations, but merely argues that Ahmad's, like Price's, backpay award should be decreased because Ahmad did not mitigate his damages. *Id.* at 17–18.

Contrary to Bannum's argument, the Board found that "Ahmad continued to search for work and made 'searches'" in 2018. *Bannum*, 372 NLRB No. 97, slip op. at 15. In making this finding, the Board pointed to Ahmad's direct testimony that "he performed a couple of job searches during this time." *Id.* at 15 n.33. The Board found this testimony credible and persuasive. "In determining whether substantial evidence supports the Board's conclusion, this Court 'do[es] not make credibility determinations or reweigh the evidence.'" *Alcoa, Inc.*, 849 F.3d at 255 (quoting *NLRB v. Allied Aviation Fueling of Dall. LP*, 490 F.3d 374, 378 (5th Cir. 2007)). There is substantial evidence to support the Board's conclusion; Bannum fails to establish facts to mitigate its liability for Ahmad's backpay.

Finally, Bannum argues that the period of backpay for both individuals must cease in September 2021, when the Bureau of Prisons caused Bannum Saginaw's closure. D. 41 (Resp't Br. at 19) (6th Cir. Nov. 29, 2023). The end date for the backpay period, however, is undisputed: All parties, and the Board itself, agree that the backpay period ends in September 2021. *Bannum*, 372 NLRB No. 97, slip op. at 13. In the Board's Supplemental Decision and Order, it explained that "[t]he appropriate gross backpay is based upon a period beginning with each discriminatee's date of termination to September 30, 2021, which was the date Bannum Saginaw closed and therefore tolled the backpay period." *Id.* This argument, accordingly, presents no basis for undermining the Board's backpay order.

**D. Adverse Inference**

Bannum additionally argues that the Board erroneously imposed an adverse inference against it for failing to comply with subpoenas in connection with the proceedings below. D. 41 (Resp't Br. at 9–12) (6th Cir. Nov. 29, 2023). We review the Board's decision to impose

evidentiary sanctions—including adverse inferences—for an abuse of discretion. *See Perdue Farms, Inc., Cookin' Good Div. v. NLRB*, 144 F.3d 830, 833–34 (D.C. Cir. 1998); *cf. NLRB v. Domsey Trading Corp.*, 636 F.3d 33, 37 (2d Cir. 2011); *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010). The Board has abused its discretion if its decision has "no reasonable basis in law," meaning the Board failed to apply the proper legal standard or "'applied the correct standard but failed to give the plain language of the standard its ordinary meaning.'" *Pannier Corp., Graphics Div. v. NLRB*, 120 F.3d 603, 606 (6th Cir. 1997) (quoting *Van Dorn Plastic Mach. Co. v. NLRB*, 736 F.2d 343, 347 (6th Cir. 1984)).

As an initial matter, National Labor Relations Board Member Kaplan observed that the administrative law judge "broadly stated that she would draw adverse inferences 'when necessary' against the Respondent, on the grounds that it failed to produce witnesses and documents pursuant to valid subpoenas, but then failed to indicate in her decision specifically when, or if, she actually did so." *Bannum*, 372 NLRB No. 97, slip op. at 1 n.1. Member Kaplan further noted that, "[t]o the extent she may have [imposed adverse inferences], . . . it [is] unnecessary to rely on" them. *Id.* We agree. Bannum argues that the Board erroneously imposed adverse inferences on it, but it fails to identify where the Board or the administrative law judge actually did so. Under these circumstances, we cannot say that the Board abused its discretion. *See Pannier Corp.*, 120 F.3d at 606.

## III. CONCLUSION

For the foregoing reasons, we **GRANT** the Board's application for enforcement and **DENY** Respondents' cross-petition.